IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SHERRY DAY,

     Plaintiff,

vs.

                                 No. CIV 01cv1123 PK/KBM-ACE

WESTINGHOUSE GOVERNMENT
ENVIRONMENTAL SERVICES CO.,
LLC, a foreign limited liability
company, and WAYNE CAPLINGER,

     Defendants.

MEMORANDUM OPINION AND ORDER

THIS MATTER comes on for consideration of Defendants' Motion for
Judgment as a Matter of Law, or in the Alternative for a New Trial filed March
10, 2003 (Doc. 91), and Defendants' Motion for Remittitur filed March 10, 2003
(Doc. 93).  Upon consideration thereof,

1. <u>Background.</u>  Following a three day trial, a jury awarded Plaintiff $1.00
in nominal damages against Defendant Westinghouse Government Environmental
Services Company, LLC ("Westinghouse") and Defendant Wayne Caplinger and
$1,031,250 in punitive damages against Mr. Caplinger.

2. <u>Judgment as a Matter of Law–Standard.</u>  Defendants move in the first
instance for judgment as a matter of law pursuant to Fed. R. Civ. P. 50.

At the close of the evidence, the court took Defendants' motion for judgment as a matter of law under advisement and submitted the case to the jury, subject to the court's later consideration of the legal questions raised by the motion.  See Fed. R. Civ. P. 50(b).  The court may grant judgment as a matter of law on a claim if (1) there was no legally sufficient evidentiary basis for a reasonable jury to find for the non-movant on an issue, and (2) the claim cannot be maintained under the controlling law without a favorable finding on that issue.  See id. 50(a)(1).  Thus, the motion should be granted only if the evidence conclusively favors the movant such that reasonable jurors could not differ as to the inferences that may be drawn.  See Weese v. Schukman, 98 F.3d 542, 547 (10th Cir. 1996).  In applying this standard, the court views the evidence and draws all reasonable inferences most favorably to the non-moving party.  Id.

   3.  Judgment as a Matter of Law Is Not Warranted on Plaintiff's Claims of Intentional Infliction of Emotional Distress, Assault, and Respondeat Superior. According to the Restatement (Second) of Torts' discussion of intentional infliction of emotional distress ("IIED"), which New Mexico has adopted, see Dominguez v. Stone, 638 P.2d 423, 426 (N.M. Ct. App. 1981); Mantz v. Follingstad, 505 P.2d 68, 75 (N.M. Ct. App. 1972), "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so."  Restatement (Second) of Torts § 46 cmt. h (1965).  If

"reasonable minds may differ" then it is up to the jury to decide "whether the conduct 'is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  Salazar v. Furr's, Inc., 629 F. Supp. 1403, 1411 (D.N.M. 1986) (quoting Restatement (Second) of Torts § 46 cmt. d). The court determined that the facts could certainly support IIED and ample evidence was produced at trial to support the jury's conclusion that Mr. Caplinger intentionally inflicted emotional distress upon and assaulted Ms. Day.

Ms. Day was called into Mr. Caplinger's office on August 28, 2000, ostensibly to discuss the Hindu religion.  Trial Tr. at 99.  The door was closed and, according to Ms. Day's testimony, Mr. Caplinger subjected her to questions about intimate matters, including her shoulders, chest, breasts, nipples, navel, pubic hair, vagina and clitoris.  Id. at 101-102.  He inquired about her sexual history, her sexual relationship with her husband, the number of sexual partners for both her and her husband, and masturbation.  Id. at 102, 113, 116.  With the questions and narrative ongoing, Mr. Caplinger approached her with his hand toward her leg and asked "how close is too close."  Id. at 101.  He then proceeded to come toward her in a threatening way with his hands toward her chest, again saying "how close is too close?"  Id.  Ms. Day then knocked him away.  Id.  Given the sexually explicit questions and that conduct, Ms. Day testified she got extremely nervous at the time and suffered afterward.  Id. at 101,

107-126.

The next day, according to Ms. Day's testimony, Mr. Caplinger came into her office and told her that he enjoyed her answers from the previous day.  Id. at 109.  Both before and after the incident, Mr. Caplinger warned Ms. Day and her coworkers that employees who complained about supervisors sexually harassing them generally lost their jobs.  Id. at 103, 126.  Mr. Caplinger did not return to work after this incident was brought to light; he retired.  Id. at 230.

Viewing the evidence in the light most favorable to the Plaintiff, the court has no doubt that an average member of the community (and of the jury) would at a minimum exclaim "outrageous!" upon hearing these facts.  See Restatement (Second) of Torts § 46 cmt. d.  Contrary to Defendants' repeated claims that such conduct is not outrageous given the employment context, this interaction between supervisor and subordinate is far beyond the conduct tolerated in an office environment in a civilized society.  The jury also could have found that Mr. Caplinger acted intentionally or recklessly (particularly given the repeated admonitions about what happens to subordinates who report sexual harassment), and that as a result of his conduct Ms. Day experienced the severe emotional distress about which she testified.

As for assault, the jury could certainly conclude that Mr. Caplinger acted with intent to cause a harmful or offensive contact with Ms. Day (or imminent apprehension of such contact) and that her apprehension of such a contact was

-4-

real and reasonable.  Defendants' contention that her fear was attributable to fears of job security and not her physical safety and integrity ignores the function of the jury.  In light of the testimony presented at trial, the jury was entitled to conclude that Mr. Caplinger assaulted Ms. Day.

Westinghouse contends that no reasonable jury could find it liable on a theory of respondeat superior.[1]  The jury could find that Mr. Caplinger's acts were fairly and naturally incidental to the business assigned him by Westinghouse, and these acts were done while Mr. Caplinger was engaged in Westinghouse's business with the view of furthering Westinghouse's interest.  The jury could also find that these acts did not arise <u>entirely</u> from some external, independent and personal motive on the part of Mr. Caplinger.  Ms. Day testified that Mr. Caplinger was the head of her department, and he filled in when her regular supervisor was gone.  Trial Tr. at 94-95.  He also was a reference for her on broad questions about work, he conducted team building exercises off-site, and administered and interpreted various personality tests given to employees.  <u>Id</u>.  Mr. Caplinger testified about company discussions about body language, "how close is too close," and personality tests.  <u>Id.</u> at 225-26.  Ms. Day also testified that Mr. Caplinger spoke of mentoring a female employee concerning a

---

[1] Defense counsel represents both the employee and the employer.  The court has previously raised the issue of potential conflict, but both Defendants assured the court in writing that they waived any conflict.  Westinghouse further assured the court that it was indemnifying Mr. Caplinger regardless.

presentation, and unbuttoning her blouse as she continued to practice as an exercise in confidence building.  Id. at 97.  There is no question that Mr. Caplinger's supervisory authority allowed this event to occur, but, more to the point, the jury could conclude that this incident was an unfortunate continuation of Mr. Caplinger's odd organizational development efforts.

4. Motion for New Trial–Standard.  Defendants also move for a new trial pursuant to Fed. R. Civ. P. 59.  A "motion for a new trial on the ground that the verdict of the jury is against the weight of the evidence is normally one of fact and not of law and is addressed to the discretion of the trial court."  Campbell v. Bartlett, 975 F.2d 1569, 1577 (10th Cir. 1992).  A motion to amend or alter the judgment will be granted "only to correct manifest errors of law or to present newly discovered evidence."  Phelps v. Hamilton, 122 F.3d 1309, 1324 (10th Cir. 1997) (quotations omitted).

5. Jury's Verdict is Not Against the Weight of the Evidence.  Defendants' first argument for a new trial is that the jury's verdict was against the weight of the evidence.  Although the standard governing a court's decision to grant a new trial under Fed. R. Civ. P. 59 is distinct from the standard under Fed. R. Civ. P. 50, 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2806 (2d ed. 1995), the court is persuaded that the conclusions reached above suffice to uphold the verdict when evaluated under the proper standard.

6. <u>Permitting Rebuttal Testimony of Heather Evans and Alisa West Does</u>
<u>Not Warrant a New Trial</u>. Defendants' second argument for a new trial is that the
court improperly allowed rebuttal testimony by Heather Evans and Alisa West
and did not provide an opportunity to Defendants for surrebuttal.  Evans and
West testified to similar conduct by Mr. Caplinger as that alleged by Ms. Day.
According to Defendants, the testimony of Ms. Evans and Ms. West was
irrelevant, unduly prejudicial, inadmissible character evidence, and inadmissible
extrinsic evidence.  Defendants also suggest that the court's rulings on this issue
are inherently contradictory because the court declined to allow the testimony in
the case-in-chief to show intent, but allowed it in rebuttal to show malice for
punitive damages.  Trial Tr. at 11-12, 179-180.

Contrary to Defendants' arguments, the testimony of Ms. Evans and Ms.
West directly refuted material statements made by Mr. Caplinger during his
testimony, and so their testimony does not constitute inadmissible character or
extrinsic evidence.  In particular, Mr. Caplinger testified that he never said to Ms.
Day the things he was alleged to have said, going on to state, "For years I've
worked to try to keep a good name, be a good–not only to be a good manager but
to be a good man, a good human being.  I don't use that kind of language.  I was
frankly very offended about it."  <u>Id.</u> at 230.  Mr. Caplinger expressly denied ever
talking to employees about such subjects as masturbation or telling women
employees to prepare for presentations by practicing while undressing (the

subjects Mr. Caplinger allegedly discussed with Ms. Day).  <u>Id.</u> at 246-47.  Mr.

Caplinger further testified that he never touched employees inappropriately and

that the "only way you should ever touch employees is to shake hands."  <u>Id.</u> at

247-48.  Finally, under cross examination Mr. Caplinger testified as follows:

> Q. As I understood your answer at the beginning of my cross-
> examination, you've indicated that your personality and your
> character is the type that you wouldn't say these things or ask these
> type of questions to any employee, would you?
>
> A. That's right.  I think the people who know me know that I'm a
> kind and gentle person, and I would not intentionally embarrass or
> harm anybody.

<u>Id</u>. at 251-52.

The testimony of Ms. Evans and Ms. West directly refuted these aspects of

Mr. Caplinger's testimony.  In deciding to allow their testimony, the court limited

the use of such rebuttal evidence to "the material issues of the defendants'

defense as opposed to merely evidence that refers to character for truthfulness or

untruthfulness."  <u>Id.</u> at 276.  Such evidence was also potentially relevant to the

issue of punitive damages, as it could go to Mr. Caplinger's state of mind,

specifically his acting with malice.  The fact that the court declined to allow such

evidence in the case-in-chief says more about the need for the court to see how

the case developed (including Mr. Caplinger's defense) than inconsistency.

Contrary to Defendants' suggestion, the sole purpose of the testimony was not to

show that, if Mr. Caplinger engaged in inappropriate behavior with Ms. Evans

and Ms. West, he must have done it here (character evidence).  Defendants did not submit a limiting instruction before the testimony, an option offered by the court.  Id. at 277-78.  Defendants' own repeated failures to object to the testimony of Ms. West and Ms. Evans when it did go beyond the scope of rebuttal (and the court sustained objections on the few occasions defense counsel did object) is hardly reason to grant a new trial.

As to Defendants' argument that they should have been provided an opportunity for surrebuttal, the decision whether to allow surrebuttal evidence is left to the discretion of the court.  Defendants were provided an opportunity to reopen their case after resting and anticipate the testimony of Ms. Evans and Ms. West but chose not to do so.  Given the reams of depositions and pretrial motions in this case, their testimony was hardly a surprise.  A new trial will not be granted simply because defense counsel might now regret their decision to offer only the testimony of Mr. Caplinger and not offer evidence relating to Ms. Evans and Ms. West.

7.  Court's Jury Instructions and Verdict Form Do Not Warrant a New Trial.  Defendants' third argument for a new trial is that the jury was confused, as displayed in the issuing of improper instructions, providing the jury with a misleading verdict form, and instructing the jury outside the presence of counsel. The court is convinced that the instructions given to the jury, when fairly read and taken as a whole, properly reflect the applicable law.

The Defendants begin by questioning even the adequacy of the statement of the case. According to the Defendants, the jury was misled by the statement that the Plaintiff "alleges that Mr. Caplinger called her into his office to discuss work matters but then asked her a series of sexually explicit and offensive questions and placed her in apprehension of imminent bodily contact." Doc. 85, Instruction 8A. The Defendants submit that the failure to attach the adverb "allegedly" to each and every phrase in the statement, but instead at the beginning of the entire phrase, "biased" the jury through a "prejudicial statement of the case." Doc. 92 at 25 n.6. It strains credulity, however, to believe that the jury (1) did not understand that the statement of the case merely recited the Plaintiff's allegations (else why had they just sat through a three day trial on precisely those issues?), and (2) did not understand that they were the "judges of the facts." Doc. 85, Instruction 2. Moreover, the statement of the case referred to the above as "plaintiff's contentions." Defendants also fault the statement of the case because it did not contain the word "reasonable" but merely "apprehension of imminent bodily contact," when describing the assault claim. Doc. 92 at 25 n.6. This is equally meritless–the jury was adequately instructed on assault in a subsequent instruction, and the statement of the case need not contain every element of a claim.

Defendants also submit that the court's failure to adopt their six-page, ten-question long Rube Goldberg verdict form, see Doc. 63 at 8-13, misled the jury.

As at trial, the court believes that the verdict form and instructions accurately reflect governing New Mexico law on intentional infliction of emotional distress and on assault.  Defendants claim in their brief that the instructions and special verdict form do "not accurately convey New Mexico law," Doc. 92 at 26, but never get around to specifying how the instructions and special verdict form fail to do so.

Instead, the Defendants merely contend that the instructions and special verdict form failed to inform the jury that punitive damages could only be assessed against Mr. Caplinger.  At first glance, this is a difficult argument to make, for the instructions expressly state that "Sherry Day seeks to recover punitive damages from Wayne Caplinger," Instruction 8K, and the special verdict form refers only to Mr. Caplinger in relation to punitive damages.

To support their jury confusion argument, Defendants rely upon (1) a reading of the instructions that disregards the express language in the instructions, and (2) notes from the jury.  The first note asked what the court meant by "the scope of his employment" as used in question three of the special verdict form.  Doc. 88 at 10.  That question asked whether Mr. Caplinger was acting within the scope of his employment with respect to the conduct that was the basis for the jury's finding of IIED and assault.  Doc. 86 at 1.  The court responded to this note telling the jury that it should refer to the instructions, particularly Instruction 7E which contains the test for scope of employment.

Given an initial inquiry from the jury with no indication that the pertinent instruction had been consulted, no other response than referring the jury to the pertinent instruction was indicated.

The second note concerns the punitive damages instruction:

Instruction #8K "In this case, Sherry Day seeks punitive damages from Wayne Caplinger."  We feel that Wayne and Westinghouse are both liable in this case to various degrees for punitive damages. How do we, or are we allowed to divide the decided punitive damages between defendants.

Doc. 88 at 11.  The court responded to this note telling the jury that it must follow the instructions.  Id.  Obviously, the jury was aware that the punitive damage instruction ran against only the individual Defendant and wanted to allocate the decided punitive damages against both Defendants, a result foreclosed by the law and the instructions.  Contrary to Defendants' suggestions, at no time did the court issue supplemental instructions to the jury outside the presence of counsel and without a court reporter present.  Instead, the jury in both instances was told to follow the instructions and the court must presume that the jury did so.

The Defendants' contention that the verdict form contributed to confusion between the Defendants insofar as punitive damages is thin.  Instruction 8K twice told the jury that Wayne Caplinger was the subject, the second time telling the jury: "If you find that the conduct of Wayne Caplinger was malicious, willful or reckless, then you may award punitive damages against him."   Instruction 8K.

-12-

The special verdict form asked whether the conduct of Wayne Caplinger was malicious, willful or reckless.  Doc. 86 at 2.

Defendants' speculation that the large amount of the punitive damages award signals an intention to assess both Defendants is only that.  "[A] verdict will not be upset on the basis of speculation about possible jury confusion," and speculation is the entirety of Defendants' arguments on this point.  Allen v. Minnstar, Inc., 97 F.3d 1365, 1373 (10th Cir. 1996) (quotation omitted).

8.  Jury's Award of Punitive Damages If Excessive in Amount May Be Cured by Remittitur.  Finally, Defendants contend that the award of punitive damages in this case shocks the judicial conscience.  "[M]ere excessiveness in the amount of an award may be cured by remittitur, whereas excessiveness which results from jury passion and prejudice may not be so cured.  In that case, a new trial is required."  Mason v. Texaco, Inc., 948 F.2d 1546, 1561 (10th Cir. 1991).  To justify a new trial, the award "must be so excessive that it shocks the judicial conscience and raises an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial."  Vining v. Enter. Fin. Group, Inc., 148 F.3d 1206, 1216 (10th Cir. 1998) (quotation omitted).  For the reasons explained below and guided by Supreme Court, Tenth Circuit, and New Mexico authority, the court concludes that the punitive damages award is excessive, though not as a result of jury passion or prejudice.

9.  Remittitur Is Warranted Only Upon Certain Due Process Grounds.

Defendants move for a remittitur of the jury's punitive damage award of $1,031,250 on the grounds that (1) nominal damages for IIED cannot support an award for punitive damages, (2) the award was grossly excessive and unreasonable and thus a deprivation of Mr. Caplinger's Fourteenth Amendment rights, (3) the punitive damage award is not supported by Mr. Caplinger's relevant wealth, and (4) the award was the product of passion, prejudice or jury confusion.

   A.  Nominal Damages Can Support Punitive Damages.  The first contention–nominal damages cannot support an award of punitive damages–is completely false.  Although Defendants cite Sanchez v. Clayton, 877 P.2d 567 (N.M. 1994), they fail, in a disturbing lack of candor, to mention its holding: "In suits based on intentional torts . . . no allegation of actual damages is necessary to establish a cause of action."  Id. at 573; see also Crawford v. Taylor, 270 P.2d 978, 979-80 (N.M. 1954) ("If, as we believe, the allegations are sufficient to sustain an award of at least nominal damages, it has already been indicated by this Court . . . that such an award, in a proper case, will support an award of punitive damages.") (citation omitted).  Defendants' argument that the severe emotional distress element of IIED is really a requirement of actual damages is completely contrary to what those terms mean and conflicts with New Mexico law.

   B.  Due Process Arguments.  Turning to the due process argument,

-14-

compensatory and punitive damages, although normally awarded simultaneously, serve different purposes in the federal system. Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 432 (2001). Compensatory damages redress concrete losses suffered by a plaintiff. Id. Punitive damages, meanwhile, are aimed at deterrence and retribution. State Farm Mut. Auto. Ins. Co. v. Campbell, 123 S. Ct. 1513, 1519 (2003). Indeed, punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition. BMW of North America v. Gore, 517 U.S. 559, 568 (1996). In the federal system, States have considerable flexibility in determining the level of punitive damages allowed in different classes of cases as well as in any particular case. Id.

It is only when an award is "grossly excessive" in relation to a State's legitimate interests in punishment and deterrence that violations of due process rights becomes a matter of concern. Id. Thus, the court must focus on the scope of New Mexico's legitimate interests in punishing defendants and deterring them from future misconduct. Id. New Mexico's interests are described in a two-part analysis: (1) the size of the verdict in light of the enormity and nature of the wrong considering aggravating and mitigating circumstances, and (2) the relation between the amount of damages and the actual injury or actual damages sustained. See Aken v. Plains Elec. Generation & Transmission Coop., Inc., 49 P.3d 662, 669 (N.M. 2002).

In addition to these state interests, the United States Supreme Court has provided a standard for determining the constitutionality of excessive punitive damage awards.  See BMW, 517 U.S. at 574-75.  In BMW, the Court held that assessing a punitive damages award's consistency with due process should consider three "guideposts": 1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.  Id.; see also State Farm, 123 S. Ct. at 1520.

It has been noted that the first two BMW guideposts are essentially the same as the factors under New Mexico law.  Aken, 49 P.3d at 669.  As to the first guidepost, the BMW Court suggested a hierarchy of reprehensibility whereby acts of violence or threats of bodily harm constitute the most reprehensible, followed by acts taken in reckless disregard for others' health or safety, affirmative acts of trickery and deceit, and lastly, acts of negligence and omission.  517 U.S. at 573-581.

Mr. Caplinger's acts consisted of intentionally inflicting harm and assaulting Ms. Day.  In viewing the reprehensibility of the conduct, the court must view all inferences in favor of the Plaintiff.  Smith v. Ingersoll-Rand Co., 214 F.3d 1235, 1253 (10th Cir. 2000).  So viewed, Mr. Caplinger's conduct as found by the jury could be viewed as reprehensible–utilizing his supervisory

-16-

authority to ask employees sexually explicit questions (with the attendant possiblity of unwanted touching) and to engage in conversations about sexual practices.  At the same time, the reprehensibility of this conduct is tempered somewhat by the nominal damages awarded in this case and the lack of physical injury.  On balance, then, imposition of a $1,031,250 punitive damages award seems excessive and warrants a more modest award of punitive damages.

As to the second guidepost–the disparity between the actual or potential harm to the plaintiff and the punitive damages award–the court discerns little guidance applicable to this case.  The BMW Court did note that "exemplary damages must bear a 'reasonable relationship' to compensatory damages." 517 U.S. at 580.  Yet, the Court also suggested that this applied primarily to economic damages.  Id. at 582-83.  This distinction is crucial here, for the nominal compensatory damages awarded to Mrs. Day reflect the jury's attempt to compensate her for a noneconomic injury.

Thus, as the BMW Court noted, "we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award."  517 U.S. at 582 (citing TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 458 (1993)) (emphasis in original).  Even further, the Court admitted in BMW that low awards of compensatory damages may properly support a higher ratio than a high compensatory award, and a "higher ratio may also be justified in cases in which

-17-

the injury is hard to detect or the monetary value of noneconomic harm might

have been difficult to determine." Id.  In other words, because the single-digit

ratio suggested in BMW specifically dealt with economic harms capable of

determination, the second guidepost does not appear to apply directly to the due

process concerns of this punitive damages award.

The third guidepost identified in BMW was the comparison of the

underlying conduct to civil or criminal penalties that could be imposed for

comparable conduct.  Id.  The BMW Court instructed courts to "accord

'substantial deference' to legislative judgments concerning appropriate sanction

for the conduct at issue."  BMW, at 583.  In this case, the court finds 42 U.S.C.

§ 1981(a) to be a comparable statute and "[t]he most relevant civil sanction,"

State Farm, 123 S. Ct. at 1526, as it provides for the compensatory and punitive

damage caps for civil rights actions, including sexual harassment–a cause of

action similar to the conduct alleged here.  The $300,000 ceiling on the amount

of punitive damages that can be awarded under § 1981 is certainly comparable.

See 42 U.S.C. § 1981a(b); see also Florez v. Delbovo, 939 F. Supp. 1341, 1348-

49 (N.D. Ill. 1996).

As the BMW Court has directed courts to "accord 'substantial deference'"

to such legislative judgments, 517 U.S. at 583, the court holds this indicium, in

connection with the others, to be the optimal guidepost of the reasonableness of

the punitive damages amount in this case.  Accordingly, the court will grant

Defendants' motion for remittitur, reducing the amount of punitive damages to the most comparable and likewise appropriate amount of $300,000.

Where the court concludes there was error only in an excessive damages award but not one also tainting the finding of liability, the court may order a remittitur and alternatively direct a new trial if the plaintiff refuses to accept the remittited amount. Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 703 F.2d 1152, 1168 (10th Cir. 1981). "[I]f an error at the trial requires a new trial on one issue, but this issue is separate from the other issues in the case and the error did not affect the determination of the other issues, the scope of the new trial may be limited to the single issue." Mason, 948 F.2d at 1552 (quoting 11 C. Wright & A. Miller, Federal Practice and Procedure § 2814 at 93 (1973) (footnotes omitted)). Indeed, perhaps the most common example is the grant of a new trial limited to damages when liability has been properly determined. Id. Therefore, if Plaintiff does not agree to remittitur, there will be a new trial on the damages issues previously tried, including Ms. Day's entitlement to compensatory or nominal damages. See Utah Foam Prods. Co. v. The Upjohn Co., 154 F.3d 1212, 1216 (10th Cir. 1998) (citing Alley v. Gubser Dev. Co., 785 F.2d 849, 856-57 (10th Cir. 1986)).

        C.  Defendants' Remaining Arguments–Evidence of Mr. Caplinger's Financial Condition Was Not Required and the Jury's Verdict Was Not the Product of Passion, Prejudice, or Jury Confusion.  Defendants' remaining

-19-

arguments may be handled briefly.  Not having attempted to introduce any evidence at trial of Mr. Caplinger's financial condition, Defendants now urge the court, again without any evidence, to consider his financial condition in order to invalidate the punitive damages award.  This the court will not do, and so it is unnecessary to decide what effect Westinghouse's agreement to indemnify Mr. Caplinger (for all damages including punitive damages) would have on the admissibility of such evidence.  See Kemezy v. Peters, 79 F.3d 33, 37 (7th Cir. 1996) ("When the defendant is to be fully indemnified, such evidence, far from being required, is inadmissible.") .  Defendants' suggestion that the Plaintiff, by seeking punitive damages, was required to put on such evidence is rejected.  Id. at 36 (holding that a Plaintiff is not required to present financial condition evidence as a condition of seeking punitive damages); Zarcone v. Perry, 572 F.2d 52, 56 (2d Cir. 1978) (defendant has the burden of showing financial condition if he wants it considered in punitive damages phase).  The court has already discussed and rejected the final point, that the jury's award of punitive damages was the result of passion, prejudice or jury confusion.

NOW, THEREFORE, IT IS ORDERED THAT:

(1)  Defendants' Motion for Remittitur filed March 10, 2003 (Doc. 93), is granted.  The amount of punitive damages awarded against the Defendant Caplinger shall be remitted from $1,031,250 to $300,000.

(2)  Defendants' Motion for Judgment as a Matter of Law, or in the

Alternative for a New Trial filed March 10, 2003 (Doc. 91), is denied as to

judgment as a matter of law and contingently denied as to a new trial pending

Ms. Day's decision whether to accept the remittitur.  If Ms. Day accepts the

remitted amount of punitive damages of $300,000, then Defendants' motion for a

new trial will be deemed denied.

     (3) Ms. Day shall notify the court within 30 days from the date of entry of

this order whether she accepts the remittitur.

     DATED this <u>22nd</u> day of July, 2003, at Santa Fe, New Mexico.


                                     _____
                                     United States Circuit Judge
                                   Sitting by Designation

Counsel:


Duane C. Gilkey, Carol L. Dominguez and George C. Kraehe, Gilkey and
Stephenson, P.A., Albuquerque, New Mexico, for Defendants.

W.T. Martin, Jr. and Roxanne R. Lara, Martin & Lara, LLP, Carlsbad, New
Mexico, for Plaintiff.